OPINION OF THE COURT
Lawrence E. Kahn, J.
The court shall grant judgment to the plaintiff declaring Executive Order No. 43, entitled, “Establishing a State Program for Voter Registration”, unlawful, unconstitutional and void, and enjoining defendants from implementing the executive order.
On July 9,1984, the Governor issued the aforesaid order and this declaratory judgment action soon followed. Plaintiff simultaneously sought a preliminary injunction to restrain implementation of the program pending a determination on the merits. This request was granted by Special Term (Clark v Cuomo, 123 Misc 2d 885), but was ultimately denied on appeal upon the rationale that plaintiff had not established irreparable injury. However, in so *969 doing, neither appellate court determined the legality of Executive Order No. 43. “[W]e are constrained to act cautiously lest we finally determine the merits of the action.” (Clark v Cuomo, 103 AD2d 244, 245.) Plaintiff’s request for an expedited trial was granted and the matter referred to Trial Term for a hearing which has now been completed.
At the outset, it is important to recognize that there are many things which this case is not. It is not a question of Democrats versus Republicans nor an issue of laudable intent. Rather, at issue here is the bedrock of constitutional law; the separation of powers between respective branches of government. “The fundamental constitutional principle of the separation of powers among the three departments of government is included by implication in the pattern of government adopted by the State of New York * * * it being a basic part of the organic law that each department should be free from interference, in the discharge of its own functions and peculiar duties, by either of the others” (Matter of Gottlieb v Duryea, 38 AD2d 634,635).
Upon the testimony and the exhibits introduced, certain facts have become evident. The challenged order seeks to create a State-wide program for voter registration and enrollment in political parties. It mandates that designated State agencies provide mail registration and enrollment forms with employees trained to assist potential registrants and enrollees in completing the forms. A Voter Registration Task Force is created whereby the Governor selects certain individuals to develop training programs for State employees assigned to implement the program and assist registrants and enrollees. The testimony established that there are plans to set up hundreds of satellite registration and enrollment locations throughout the State, where persons will be able to register and enroll in a political party with the assistance of designated State employees under the direct supervision, control and auspices of the Governor and various State agencies designated by him.
Defendant urges that he has simply made the facilities of State offices regularly visited by the public available to assist in implementing the laudable public policy of increased voter registration. This assertion is not supported by the evidence adduced at trial. The exhibits introduced *970 at trial establish that the defendant’s signs contain boldfaced announcements encouraging enrollment in a political party as separate and distinct from voter registration. Other signs proclaim: “Register To Vote Here”. The evidence is uncontroverted that assistance is actively offered in both registration and enrollment. In defense of the plan, defendant Dullea acknowledges that “government has found it necessary to provide a system of registration to prevent abuses and to ensure the eligibility of those who exercise this important right.” He further asserts that “unfortunately, this needed regulatory apparatus in many instances creates a roadblock to the exercise of this fundamental franchise.” He implies that the “roadblocks” implemented by the Legislature somehow must be circumvented or bypassed, and that the creation of the Voter Registration Task Force will help cure those problems created by the present system of registration. Such a philosophy does injustice to the doctrine of separation of powers (Youngstown Co. v Sawyer, 343 US 579).
Evidence adduced at trial establishes that “assistance” will be encouraged and offered to potential registrants and party enrollees. According to the mandates of the executive order, State agencies are directed to provide staff to assist in the filling out of the forms. The Deputy Commissioner of the Department of Taxation and Finance immediately recognized the problem when he stated: “We ought to give careful consideration to the propriety of having a taxpayer seek technical assistance with his registration form from the same employee who is answering questions about his tax form. This would combine two very sensitive areas and may convey the impression that we are linking personal financial and tax information with electoral and perhaps, political activity.” The Legislature has, in fact, enacted section 5-216 of the Election Law, which authorizes assistance to an applicant in limited instances when a person is unable to read or write due to disability or illiteracy. Further, only in such instances may an applicant receive assistance in order to enroll in a political party. As envisioned by the Governor, this legislative mandate of neutrality will be abrogated in its entirety. Thus, upon the proof at trial, it is clear that Executive Order No. 43 is not *971 “passive” or merely an informational or promotional plan to encourage registration, but rather, is an alternative, State-wide registration system beyond the parameters of the Legislature and the Election Law.
That private citizens or partisan organizations may actively engage in the distribution of registration application forms without regard to partisanship is beyond question, but not the issue before this court. While private citizens may wage a campaign to enroll voters sympathetic to their particular point of view, the function of government is to remain neutral. It thereby ensures fairness, and in so doing, avoids even the appearance of partisanship. The Constitution contains a mosaic of principles which collectively seek to preserve this basic tenet of the electoral process, and places the authority to implement its mandate squarely within the legislative branch of government. Any attempt at usurption or circumvention of this grant of authority must be closely reviewed, lest it be eroded imperceptibly by an unfettered, however well-intentioned executive. Justice Jackson, in resolving a similar question on the national level, instructed us that “[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb * * * courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.” (Youngstown Co. v Sawyer, supra, pp 637-638.)
It has long been recognized that the Legislature has been constitutionally delegated direct and clear authority in the realm of political affiliations, elections and voting. “In the construct of any political philosophy under our polity, to the extent that government is involved in elective processes, the role of the legislative branch must be recognized as paramount.” (Matter of Higby v Mahoney, 48 NY2d 15, 21; emphasis supplied.) It is equally clear that “[h]owever laudable its goals, the executive branch may not override enactments which have emerged from the lawmaking process.” (Matter of County of Oneida v Berle, 49 NY2d 515, 523.) Reserving this principle as our pole star, nevertheless, it is equally apparent that “there are areas in which *972 the responsibilities of the three great branches of government overlap or intersect, and in which powers cannot be immutably fixed” (supra, p 523). Thus, if Executive Order No. 43 was merely “the implementation of an informational and promotional program” (Clark v Cuomo, 63 NY2d 96, 98), the issue of intrusion into legislative prerogative would be less compelling. However, the order implements a program which encroaches upon an area reserved exclusively for a coordinate branch of government, and must fall, however well intentioned, laudable or innocuous, “for history teaches that a foundation of free government is imperiled when any one of the coordinate branches absorbs or interferes with another. Tt is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men’ ” (Matter of County of Oneida v Berle, supra, p 522).
The issue is not whether the challenged order conflicts with legislative policy, for even if it is in perfect harmony, it is for the legislative branch, not the executive, to determine the particulars of accomplishing the stated goal of increasing voter registration or enrollment in a political party. There is no implicit constitutional authority which suggests that this is an area for the sharing of authority between the executive and legislative branches. Nor has the Legislature left a vacuum in this area. It has explicitly and in detailed fashion legislated the enrollment and registration aspect of the elective process. In that regard, it has chosen to delegate the responsibility for the dissemination of voter registration applications to local county boards of elections (Election Law, § 5-210, subd 2). It could have assigned this responsibility to the Department of Motor Vehicles, but has chosen not to. It could require the Department of Taxation and Finance to mail a registration application with every tax refund. It has declined to do so. It could have mandated that social services’ checks include a voter registration application. It has enacted no such requirement.*
*973 No area of our government is more sacrosanct than the election process. Because the very essence of our democracy rests on an impartial party enrollment and registration system, the framers of our Constitution were most explicit in vesting the authority with the Legislature. In turn, the Legislature has been most specific in creating a detailed procedure with respect thereto. While the defendants contend that their program is innocuous and merely encourages and promotes enrollment and registration (in themselves laudable goals), the proof establishes that they have in fact created a separate apparatus which falls beyond the ambit of the Legislature and is controlled, regulated and administered exclusively by the executive branch of government. This apparatus includes the expenditures of State funds to run the program; the establishment of hundreds of satellite enrollment and registration locations throughout the State; the assignment of employees to administer and assist persons as they register and enroll; and the transportation of completed enrollment and registration forms to the appropriate boards of elections throughout the State. In essence then, the executive branch of government by its order is going into the election business. By establishing hundreds of registration and enrollment locations throughout its agencies, it is creating for itself, without constitutional or statutory mandate, an entire area of political activity heretofore unknown. Defendants urge a subtle distinction to this court that it is really not enrolling or registering voters but merely promoting and encouraging this activity. However, this distinction cannot escape the very real fact that the executive order creates within the executive branch, its own autonomously sponsored, controlled and regulated enrollment and registration program. The order does not direct that a legislative policy be executed in the manner prescribed by the Legislature; rather, it directs that an executive policy be executed in the manner prescribed by the executive.
Defendant’s rationale would legitimize an executive agency for the registering and enrolling of voters, merely *974 by emphasizing that the entire massive program is not really registration or enrollment in the strict sense. Thus, with a wink and a nod, the encroachment into this heretofore exclusive legislative area would be complete, save for the ministerial act of recording the data at the Board of Elections. The practical effect of the executive order would be to place a vital aspect of the election process, registration and enrollment, within the executive realm. Of all areas of government, it is the elective process that must be most jealously guarded from excess of authority by any branch of government. The elective process is vulnerable to abuse; the keystone of our freedom; and the governmental apparatus that must be most vigorously protected by the doctrine of separation of powers. Each crack in the dam of democracy has the potential to wash away safeguards painstakingly constructed over the years. Thus, this intrusion into an area reserved for the Legislature may not be sanctioned however well intentioned. “Not so long ago it was fashionable to find our system of checks and balances obstructive to effective government. It was easy to ridicule that system as outmoded — too easy. The experience through which the world has passed in our own day has made vivid the realization that the Framers of our Constitution were not inexperienced doctrinaires. These long-headed statesmen had no illusion that our people enjoyed biological or psychological or sociological immunities from the hazards of concentrated power * * * The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.” (Youngstown Co. v Sawyer, 343 US 579, 593-594, supra.)

 During the 1983-1984 session, the Legislature had before it a bill introduced by Assemblyman Norman which would have amended the Election Law to include a plan for the distribution of registration forms which was almost identical to the plan contained in Executive Order No. 43. The Legislature chose not to pass the bill. The *973 rejection of the amendment is “a significant circumstance” compelling the conclusion that the Legislature does not want voter registration forms distributed by agencies of government other than local boards of elections (American Airlines v State Comm. for Human Rights, 29 AD2d 178, 181).